COURT OF APPEALS OF VIRGINIA

Present:   Judges Petty, Beales and Senior Judge Coleman
Argued at Richmond, Virginia


GARY PRIZZIA

                                                                OPINION BY
v.       Record No. 1343-10-2                        JUDGE WILLIAM G. PETTY
                                                                  APRIL 12, 2011

JUDIT PRIZZIA


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Daniel T. Balfour, Judge[1]

        Charles E. Powers (Batzli Wood & Stiles, PC, on briefs), for
        appellant.

        Susan C. Armstrong (George A. Somerville; Butler Armstrong, LLP;
        Troutman Sanders LLP, on briefs), for appellee.


I.  BACKGROUND

     Gary Prizzia ("husband") and Judit Prizzia ("wife") were married in Hungary on August

28, 1999.  While they were living there, their only child was born on February 3, 2000.  In April

2000, the Prizzias moved to Virginia, where they resided until December 15, 2002.  On that date,

both parties took the child to Hungary for a visit over the Christmas holidays.  Husband returned

to Virginia on December 25, 2002, and wife and the child remained in Hungary.  On February 4,

2003, wife filed for divorce in Hungary, requesting custody of the child.  Upon learning of wife's

actions, husband filed for divorce in the Circuit Court of Henrico County on May 6, 2003.

Husband's complaint also requested the court to award him custody of the child and to make an

equitable distribution of the marital estate.

_____

        [1] The Honorable George F. Tidey originally presided over this case when it began.  Judge
Tidey entered an order on December 30, 2003, declining to exercise jurisdiction over divorce,
child custody, visitation, and child support at that time.  Judge Balfour assumed the case upon
Judge Tidey's retirement.

On December 30, 2003, the trial court entered an order finding "that Hungary ha[d] proper jurisdiction over the parties as to divorce, custody, visitation and child support," and accordingly "decline[d] to exercise jurisdiction over [those] matters at [that] time." Furthermore, the trial court's order provided that "[a]fter a final decree of divorce is granted in Hungary, this [c]ourt will hear argument on equitable distribution and spousal support." Finally, the order stated: "In the future, if spousal support and/or child support is awarded in this [c]ourt, it can be made retroactive."

On March 19, 2005, the Hungarian court granted the parties a divorce and awarded custody of the child to wife, with visitation rights to husband. The Hungarian court did not award child support, nor did it divide the parties' property. Husband then sought to revive the dormant proceeding in Henrico County in order to address all issues other than the divorce. Wife did not return to Virginia for the hearings, but was granted permission to present testimony by telephonic deposition.

On May 24, 2010, the trial court entered a final decree. The final decree addressed the issues of equitable distribution, child support, and spousal support. The trial court declined to enter any order dealing with the issues of divorce or child custody, choosing instead to defer to the Hungarian court's ruling on those issues.

On appeal, husband assigns numerous errors to the trial court's actions, and wife argues three additional assignments of error as well. We discuss additional facts that are relevant to specific assignments of error in our analysis below.

II. ANALYSIS

A. Child Custody and Visitation

Husband first argues that the trial court erred in finding that the Hungarian court had jurisdiction to decide the issues of child custody and visitation. Thus, he posits, the trial court

- 2 -

erred in failing to exercise its jurisdiction over those issues.[2] Where multiple states or foreign

countries have potential initial jurisdiction over child custody, the Uniform Child Custody

Jurisdiction and Enforcement Act (UCCJEA) dictates where actual jurisdiction shall be

exercised. Here, we conclude that the trial court failed to follow the requirements of the

UCCJEA.

### 1. Jurisdiction To Make an Initial Child Custody Determination

To determine whether a court of this Commonwealth has jurisdiction to make an initial

child custody determination,[3] we look to Code § 20-146.12:

> A. Except as otherwise provided in § 20-146.15 [the section
> providing for temporary emergency jurisdiction], a court of this
> Commonwealth has jurisdiction to make an initial child custody
> determination only if:
>
> 1. This Commonwealth is the home state of the child on the date
> of the commencement of the proceeding, or was the home state of
> the child within six months before the commencement of the
> proceeding and the child is absent from this Commonwealth but a
> parent or person acting as a parent continues to live in this
> Commonwealth;

---

[2] Husband also assigns error to the trial court's finding that the Hungarian court had jurisdiction to enter a decree of divorce and to the trial court's decision to defer to that court's jurisdiction. However, since husband has not provided us with any argument or legal support in his brief for why the trial court erred in deferring to the Hungarian court's jurisdiction over divorce, we will not consider this particular issue. See Rule 5A:20(e) (requiring the argument for each assignment of error in an appellant's opening brief to include "principles of law and authorities"); see also Fadness v. Fadness, 52 Va. App. 833, 851, 667 S.E.2d 857, 866 (2008) ("If the parties believed that the circuit court erred, it was their duty to present that error to us with legal authority to support their contention."); Buchanan v. Buchanan, 14 Va. App. 53, 56, 415 S.E.2d 237, 239 (1992) ("Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration. We will not search the record for errors in order to interpret the appellant's contention and correct deficiencies in a brief.").

[3] The UCCJEA defines "child custody determination" as "a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, or modification order." Code § 20-146.1. A "child custody proceeding" is "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue." Id.

2. A court of another state does not have jurisdiction under subdivision 1, or a court of the home state of the child has declined to exercise jurisdiction on the ground that this Commonwealth is the more appropriate forum under § 20-146.18 or § 20-146.19, and (i) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this Commonwealth other than mere physical presence and (ii) substantial evidence is available in this Commonwealth concerning the child's care, protection, training, and personal relationships;

3. All courts having jurisdiction under subdivision 1 or 2 have declined to exercise jurisdiction on the ground that a court of this Commonwealth is the more appropriate forum to determine the custody of the child under § 20-146.18 or § 20-146.19; or

4. No court of any other state would have jurisdiction under the criteria specified in subdivision 1, 2, or 3.

As subsection (B) makes clear, "Subsection A is the exclusive jurisdictional basis for making a child custody determination by a court of this Commonwealth." Code § 20-146.12(B). Thus, to determine whether a court of this Commonwealth had jurisdiction to make an initial child custody determination in this case, we must first decide what the "home state" of the child was on May 6, 2003, the date this proceeding was commenced.

The UCCJEA defines "home state" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. . . . A period of temporary absence of any of the mentioned persons is part of the period." Code § 20-146.1. Hence, a child's "home state" is where the child has lived with one or more of his parents for the consecutive six-month period immediately preceding the date on which a child custody proceeding is filed.

However, this is not the only six-month period we must consider in analyzing initial jurisdiction over child custody under Code § 20-146.12(A)(1). Where, as here, the child was not living in Virginia on the date the proceeding was filed, we must determine if Virginia was the child's home state at any time during the six months before the filing date. If so, Virginia would

- 4 -

continue to have initial jurisdiction. See Code § 20-146.12(A)(1) (prescribing initial custody jurisdiction if the "Commonwealth is the home state of the child on the date of the commencement of the proceeding, *or* was the home state of the child within six months before the commencement of the proceeding and the child is absent from this Commonwealth but a parent or person acting as a parent continues to live in this Commonwealth"[4] (emphasis added)). This alternate basis for jurisdiction becomes relevant in instances where a child has acquired a new residence less than six months before the commencement of a custody proceeding, thus rendering the child technically without a home state as of the date of the commencement of the proceeding. In such a case, the court must examine whether the child had a home state at any point within the six-month period preceding the date of filing. In other words, the court must ask whether at any point throughout the six months preceding the date of filing, it could be said that on a particular date, the child had lived with a parent in a particular state for at least six consecutive months. The purpose behind this statutory scheme is to extend a state's home state status throughout the six-month period it would take for another state to become the child's new home state.

Thus, if a child lived with a parent in Virginia for six months and then moved to another state (or another country, for that matter), Virginia would continue to have jurisdiction to make an initial child custody determination under Code § 20-146.12(A)(1) until the child had lived long enough in the other state (i.e., six months) for that state to become the child's new home state. See Code § 20-146.1.

With this understanding of the UCCJEA's basic jurisdictional scheme in mind, we need not decide whether the child's presence in Hungary from December 15, 2002 to May 6, 2003

---

[4] It is undisputed that husband, one of the child's parents, has continued to live in Virginia since the commencement of this proceeding.

constituted a "period of temporary absence" within the meaning of Code § 20-146.1, thus rendering Virginia the home state as of the date of filing, or whether the child had actually changed residence from Virginia to Hungary during that time. Even if the child's residence had permanently changed on December 15, 2002 from Virginia to Hungary, Virginia continued to have initial child custody jurisdiction for six months after that date. Thus, as of May 6, 2003, the date on which husband commenced this custody proceeding, Virginia either was the child's home state or had been the child's home state within the previous six months. This means that under Code § 20-146.12(A)(1), Virginia had jurisdiction to make an initial child custody determination.

### 2. Declining To Exercise Jurisdiction Under the UCCJEA

Having concluded that Virginia had jurisdiction to make an initial child custody determination, we must next analyze whether the trial court properly declined to exercise its jurisdiction under the UCCJEA. In analyzing this issue, we must decide as a subsidiary issue whether Hungary also had jurisdiction under the UCCJEA's jurisdictional framework. In considering this question, we treat the Hungarian court as we would a court of another state in the United States: "A court of this Commonwealth shall treat a foreign country as if it were a state of the United States for purposes of applying this article and Article 2 (§ 20-146.12 et seq.) of this chapter." Code § 20-146.4(A).

Code § 20-146.4(B) directs that "a child custody determination made in a foreign country under factual circumstances in substantial conformity with the jurisdictional standards of this act must be recognized and enforced under Article 3 (§ 20-146.22 et seq.) of this chapter." In other words, a Virginia court must recognize and enforce a foreign custody determination if the facts

- 6 -

of the case would have supported a finding of jurisdiction by the foreign court had it applied the jurisdictional standards of the UCCJEA.[5]

Here, when we apply the jurisdictional standards of the UCCJEA to the facts before the Hungarian court as of February 4, 2003, when wife first filed her divorce and custody petition, we conclude that the Hungarian court did not exercise jurisdiction "under factual circumstances in substantial conformity with" the UCCJEA's jurisdictional standards.  See Code § 20-146.4(B).  Essentially, we are faced with the question, "Under the standards of Code § 20-146.12, did the Hungarian court have jurisdiction to make an initial child custody determination as of February 4, 2003?"  We hold that it did not.

First, Hungary was not the "home state" of the child in February 2003, when wife filed her divorce and custody petition in the Hungarian court.  The child had not yet lived in Hungary for six months as of February 4, 2003.  Furthermore, Hungary had not been the home state of the child at any time during the six-month period immediately preceding the date of wife's filing on

---

[5] We note that this is essentially the same test one would formulate by reading Code §§ 20-146.4(A) and 20-146.24(A) together.  Code § 20-146.4(A) requires us to treat a foreign court as if it were a domestic court of another state for purposes of determining jurisdiction under the UCCJEA, and Code § 20-146.24(A) provides:

> A court of this Commonwealth shall recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this act or the determination was made under factual circumstances meeting the jurisdictional standards of this act and the determination has not been modified in accordance with this act.

Thus, these two sections, when read together, would require a Virginia court to recognize and enforce a foreign court's child custody determination if the foreign court would have had jurisdiction under the standards of the UCCJEA or under a jurisdictional standard "in substantial conformity" therewith.  This test is essentially what Code § 20-146.4(B) explicitly prescribes.

February 4, 2003.[6]  Thus, Hungary did not have jurisdiction under Code § 20-146.12(A)(1) at the time of wife's filing.  Rather, Virginia continued to have home state jurisdiction at that time.

Second, Hungary did not have jurisdiction pursuant to any of the other potential avenues for obtaining jurisdiction under Code § 20-146.12(A), viz., subsections (A)(2), (A)(3), and (A)(4).  This is for two reasons:  (1) Virginia retained home state jurisdiction under Code § 20-146.12(A)(1); and (2) the Virginia trial court did not decline to exercise jurisdiction on the ground that the Hungarian court was the more appropriate forum in accordance with the requirements of Code § 20-146.18 or Code § 20-146.19.  See Code § 20-146.12(A)(2)-(4).  We have already discussed the first reason.  We will now explain the second.

Although the trial court said it was "declin[ing] to exercise jurisdiction" over child custody matters in this case, the trial court did not decline to exercise its jurisdiction in a manner that conformed either to Code § 20-146.18 or to Code § 20-146.19.

Code § 20-146.18(A) provides:

> A court of this Commonwealth that has jurisdiction under this act to make a child custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient

---

[6] Counsel for wife contended at oral argument that Hungary had always been the child's home state because the time the child lived in Virginia constituted a "temporary absence" from Hungary under the UCCJEA's definition of "home state."  See Code § 20-146.1.  She premised this argument on wife's testimony that the family always intended to return to Hungary to live.  We find this argument to be without merit.  Even if the trial court believed wife's testimony that the parties intended to return to Hungary after a two-year period in Virginia, the fact remains that the parties purchased a home and actually *lived* in Virginia for over two-and-a-half years.  The UCCJEA defines "home state" as "the state in which a child *lived*."  Code § 20-146.1.  The intent to live somewhere else in the future does not negate the fact that the parties here *lived* with the child in Virginia long enough to make Virginia the child's home state under the UCCJEA.  See Powell v. Stover, 165 S.W.3d 322, 326, 328 (Tex. 2005) (declining "to apply a test to determine where a child 'lived' based on the parties' subjective intent," and instead holding "that in determining where a child lived for purposes of establishing home-state jurisdiction, the trial court must consider the child's physical presence in a state").  The parties' voluntary two-and-a-half-year residence in Virginia is simply not a "temporary absence" within the meaning contemplated by Code § 20-146.1.

- 8 -

forum under the circumstances and that a court of another state is a more appropriate forum.

However, Code § 20-146.18 does not permit a court simply to declare that it has decided to decline to exercise jurisdiction. Rather, Code § 20-146.18(B) requires:

> Before determining whether it is an inconvenient forum, a court of this Commonwealth *shall* consider whether it is appropriate for a court of another state to exercise jurisdiction. For this purpose, the court *shall allow the parties to present evidence and shall consider all relevant factors . . . .*

(Emphasis added.) The statute then lists eight specific factors the court must consider in determining whether to decline to exercise jurisdiction under this section.[7]

---

[7] Those factors are:

> 1. Whether domestic violence has occurred and is likely to continue in the future and which state could best protect the parties and the child;
>
> 2. The length of time the child has resided outside this Commonwealth;
>
> 3. The distance between the court in this Commonwealth and the court in the state that would assume jurisdiction;
>
> 4. The relative financial circumstances of the parties;
>
> 5. Any agreement of the parties as to which state should assume jurisdiction;
>
> 6. The nature and location of the evidence required to resolve the pending litigation, including testimony of the child;
>
> 7. The ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and
>
> 8. The familiarity of the court of each state with the facts and issues in the pending litigation.

Code § 20-146.18(B).

Thus, in order for a trial court to decline to exercise jurisdiction under Code § 20-146.18, it must specifically determine two things: (1) "that it is an inconvenient forum under the circumstances," and (2) "that a court of another state is a more appropriate forum." Code § 20-146.18(A). Furthermore, in "consider[ing] whether it is appropriate for a court of another state to exercise jurisdiction," the trial court *must* both "allow the parties to present evidence" and "consider all relevant factors, including [those listed in the statute]." Code § 20-146.18(B).

Here, the trial court failed to do what the statute requires. The trial court made no specific determination that Virginia was an inconvenient forum under the circumstances or that the Hungarian court was a more appropriate forum. Moreover, the trial court did not allow the parties to present all relevant evidence, as husband requested, on the issue of whether it was more appropriate for the Hungarian court to exercise jurisdiction. Because it did not allow the parties to present evidence pertaining to the statutory factors, the trial court could not have based its decision on a proper review of those factors. Thus, we conclude that by failing to follow the requirements of Code § 20-146.18, the trial court did not properly decline to exercise its jurisdiction pursuant to that section.

The second way a trial court can decline to exercise its jurisdiction over child custody is set forth in Code § 20-146.19, which states that "if a court of this Commonwealth has jurisdiction under this act because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction unless [one of certain enumerated exceptions is met]." Code § 20-146.19(A). Here, there is no evidence that Virginia had home state jurisdiction because husband had engaged in unjustifiable conduct. The trial court did not make this finding, nor did it base its decision to decline to exercise jurisdiction on Code § 20-146.19. Therefore, this second avenue for declining to exercise jurisdiction does not apply to this case.

Because the trial court did not properly decline to exercise its jurisdiction under Code § 20-146.18 or Code § 20-146.19, its vague, unexplained, general decision to decline to exercise jurisdiction was improper under the UCCJEA. Moreover, since Virginia had jurisdiction to make an initial child custody determination under Code § 20-146.12(A)(1), and since the Virginia trial court did not properly decline to exercise this jurisdiction pursuant to either Code § 20-146.18 or Code § 20-146.19, Hungary did not have jurisdiction to make an initial child custody determination under Code § 20-146.12(A)(2), (A)(3), or (A)(4). Therefore, under the jurisdictional standards of the UCCJEA, Virginia had jurisdiction to make an initial child custody determination, and Hungary did not.[8] Accordingly, it was error for the trial court to defer to the Hungarian court on the issue of child custody in the manner that it did. We thus reverse this decision of the trial court and remand for the trial court to decide whether to exercise its jurisdiction and award custody pursuant to Virginia law. In making that determination, the

_____

[8] Because we conclude that Hungary did not have jurisdiction to make an initial child custody determination under the jurisdictional standards of the UCCJEA, wife's appeal to Code § 20-146.17(A) is unavailing. That section provides:

> [A] court of this Commonwealth may not exercise its jurisdiction under this article if, at the time of the commencement of the proceeding, a proceeding concerning the custody of the child has been previously commenced in a court of another state having jurisdiction substantially in conformity with this act, unless the proceeding has been terminated or is stayed by the court of the other state because a court of this Commonwealth is a more convenient forum under § 20-146.18.

Code § 20-146.17(A). For the reasons we have already explained, the Hungarian court did not have jurisdiction substantially in conformity with the jurisdictional standards of the UCCJEA. Furthermore, the proceedings instituted by husband pursuant to the Convention on the Civil Aspects of International Child Abduction ("Hague Convention") did not constitute "a proceeding concerning the custody of [a] child" under Code § 20-146.17(A). See Code § 20-146.22 (distinguishing between "an order for return of a child under the Hague Convention" and "a child custody determination"); Convention on the Civil Aspects of International Child Abduction, art. 19, *done* Oct. 25, 1980, 1343 U.N.T.S. 89 (providing that "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue"). Therefore, Code § 20-146.17 does not apply to the facts of this case.

trial court must allow the parties to present evidence and must consider all relevant factors, including those expressly listed in Code § 20-146.18(B).[9] If, based on that consideration, the trial court concludes that Virginia is an inconvenient forum under the current circumstances and that Hungary is currently a more appropriate forum for determination of child custody, the trial court may decline to exercise its jurisdiction under Code § 20-146.18.

### B.  Child Support

Husband assigns error to the trial court's award of child support on several grounds, arguing that:  (1) the trial court did not have jurisdiction to award child support; (2) the trial court erred in applying the wrong standard of proof in its decision not to deviate from the statutory guidelines; and (3) the trial court erred in awarding child support retroactive to the date wife filed her initial pleadings.  We disagree with husband's contentions.

### 1.  Jurisdiction over Child Support

Initially, husband argues that the trial court did not have jurisdiction to award child support because it had previously ruled the Hungarian court had proper jurisdiction over child support.  In its order of December 30, 2003, the trial court did find that Hungary had proper jurisdiction over child support and accordingly declined to exercise jurisdiction over child support at that time.  However, this order did not constitute a finding that the trial court had no jurisdiction over child support.  Rather, the trial court was simply declining to exercise jurisdiction over child support at that particular time.  See Prizzia v. Prizzia, 45 Va. App. 280, 286, 610 S.E.2d 326, 329 (2005) (noting that the language of the trial court's order in this case

---

[9] We note that Code § 20-146.18(B) simply requires a trial court to consider various factors, and does not require it "'to quantify or elaborate exactly what weight or consideration it has given to each of the statutory factors.'" Gottlieb v. Gottlieb, 19 Va. App. 77, 94, 448 S.E.2d 666, 676 (1994) (quoting Alphin v. Alphin, 15 Va. App. 395, 405, 424 S.E.2d 572, 578 (1992)) (explaining a similar requirement in Code § 20-107.3(E)).

- 12 -

"does not preclude the possibility that the court would later exercise jurisdiction and rule on the merits of the case").

Husband also argues that Code § 20-107.2 did not give the trial court jurisdiction to award child support in this case. Code § 20-107.2 provides:

> Upon entry of a decree providing (i) for the dissolution of a marriage, (ii) for a divorce, whether from the bond of matrimony or from bed and board, (iii) that neither party is entitled to a divorce, or (iv) for separate maintenance, the court may make such further decree as it shall deem expedient concerning the custody or visitation and support of the minor children of the parties . . . .

As husband notes, none of these four prerequisites appear to be present in this case. The trial court did not divorce the parties; the Hungarian court divorced them. Although wife argues that the trial court decreed neither party was entitled to a divorce under Code § 20-107.2(iii), the trial court did not deny the parties a divorce on the merits of their case. Rather, the trial court simply declined to exercise jurisdiction over the issue of divorce. An order declining to exercise jurisdiction over divorce is not the same as a decree denying a divorce on the merits, as Code § 20-107.2(iii) appears to contemplate. Thus, we will assume without deciding that Code § 20-107.2 did not give the trial court jurisdiction to award child support in this case.

However, that does not mean that the trial court erred in awarding child support. Husband's counsel conceded at oral argument that if the trial court had jurisdiction over child custody, it would also have had jurisdiction over child support. We agree. Code § 16.1-241(A)(3) provides that the juvenile and domestic relations district court has jurisdiction over all cases where the custody, visitation, or support of a child "is a subject of controversy or requires determination." However, that section also expressly states that "[i]n such cases jurisdiction shall be concurrent with and not exclusive of courts having equity jurisdiction." Code § 16.1-241(A)(3). In this case, the trial court had equity jurisdiction, because the case originally began as a suit for divorce. We hold that where a case is originally filed as a divorce

- 13 -

proceeding and includes child custody and child support issues, and where the trial court has jurisdiction to decide child custody[10]—even though it does not end up exercising jurisdiction over the divorce itself—the trial court also retains jurisdiction to award child support as an equitable concomitant to its jurisdiction over child custody.

Thus, we conclude that the trial court had jurisdiction to award child support in this case.

## 2. Failure To Deviate from Statutory Guidelines

Husband next argues that the trial court erred in failing to deviate from the statutory guidelines because it did not apply the proper standard of proof. As husband notes, Code § 20-108.1(B) creates a rebuttable presumption that the amount of child support set forth in the statute is proper. See Code § 20-108.1(B). To rebut this presumption and deviate from the statutory guidelines, the court must find "that the application of such guidelines would be unjust or inappropriate in a particular case." Id. Here, the trial court found there was "no ostensible reason to deviate" from the statutory guidelines, and accordingly ordered husband to pay child support to wife "pursuant to statutory guidelines." Husband argues this was not the proper standard for the trial court's decision not to deviate from the guidelines.

The problem with husband's argument is that Code § 20-108.1(B) does not require a trial court to make any finding at all when it decides to follow the guidelines. A trial court imposing the statutory guideline amount need not specifically find that application of the guideline amount *would not* be unjust or inappropriate. Rather, this section simply requires a trial court to make a specific finding that application of the guidelines *would* be unjust or inappropriate when it

---

[10] We note that wife has not challenged the trial court's jurisdiction over child custody on the grounds of Code § 20-107.2. Therefore, we do not address this issue. See Rule 5A:21(d) (requiring that an appellee's brief contain "the argument (including principles of law and authorities) relating to each assignment of error"). Rather, our narrow holding here is simply that a trial court having jurisdiction to determine child custody in a proceeding that began as a divorce proceeding also has jurisdiction to make a child support award.

decides to deviate from those guidelines.  See id.  Since the trial court here followed the statutory

guideline amount, it was not required to make any findings regarding whether that amount was

unjust or inappropriate.  No finding was necessary to support its decision to follow the

guidelines.  Accordingly, we affirm the trial court's decision to follow the statutory guidelines in

determining the amount of child support.

### 3.  Retroactive Child Support

Husband's third assignment of error related to child support is that the trial court erred in

awarding child support retroactive to the date wife filed her initial pleadings.  Husband contends

the trial court had no jurisdiction to award this retroactive child support because the trial court

had already ruled it had no jurisdiction over child support.  In reality, however, the trial court

never so ruled.  As we have explained above, supra II.B.1, the trial court's order of December

30, 2003 did not constitute a finding that the trial court had no jurisdiction over child support.

Rather, it was simply a decision to decline to exercise jurisdiction over child support at that

particular time.[11]  Because this order is no basis for saying the trial court had no jurisdiction over

child support, we affirm the trial court's award of child support retroactive to the date wife filed

her initial pleadings.[12]

---

[11] We also note that the order expressly contemplated a later possible award of retroactive child support:  "In the future, if spousal support and/or child support is awarded in this [c]ourt, it can be made retroactive."

[12] Although husband stated in his assignment of error that "no evidence was presented upon which to determine any liability for child support prior to the evidentiary hearing," husband did not explain or develop this argument in his brief.  Thus, we do not consider it.  See Rule 5A:20(e) (requiring the argument for each assignment of error in an appellant's opening brief to include "principles of law and authorities"); see also Fadness, 52 Va. App. at 851, 667 S.E.2d at 866 ("If the parties believed that the circuit court erred, it was their duty to present that error to us with legal authority to support their contention."); Buchanan, 14 Va. App. at 56, 415 S.E.2d at 239 ("Statements unsupported by argument, authority, or citations to the record do not merit appellate consideration.  We will not search the record for errors in order to interpret the appellant's contention and correct deficiencies in a brief.").

Husband next argues that the trial court erred in finding husband gifted his separate interest in the marital residence to wife. Wife challenges, for the first time on appeal, the trial court's jurisdiction to make an equitable distribution award. We disagree with both of the parties' contentions. For the sake of logical organization, we will address wife's jurisdictional challenge first.

1. Jurisdiction over Equitable Distribution

We requested the parties to provide supplemental briefs on the following issues: (1) whether the trial court had jurisdiction under Code § 20-107.3 to make an equitable distribution award; and (2) if the trial court did not have jurisdiction under Code § 20-107.3, whether this jurisdictional defect was waived by lack of appropriate objection below. We conclude that even if the jurisdictional prerequisites of Code § 20-107.3 were not met, wife's failure to object on these grounds below effectively waived any such alleged defects.

Wife contends that if the prerequisites of Code § 20-107.3 are not met, a court is without subject matter jurisdiction to divide a marital estate. We disagree. As the Supreme Court has recently reiterated, "'subject matter jurisdiction . . . is the authority granted through constitution or statute to adjudicate a class of cases or controversies.'" Ghameshlouy v. Commonwealth, 279 Va. 379, 389, 689 S.E.2d 698, 703 (2010) (quoting Bd. of Supervisors v. Bd. of Zoning Appeals, 271 Va. 336, 344, 626 S.E.2d 374, 379 (2006)). Significantly, however, the Supreme Court has "'emphasiz[ed] the necessary distinction to be drawn . . . between the power of a court to adjudicate a specified class of cases, commonly known as "subject matter jurisdiction," and the authority of a court to exercise that power in a particular case.'" Nelson v. Warden, 262 Va. 276, 281, 552 S.E.2d 73, 75 (2001) (omission in original) (quoting Moore v. Commonwealth, 259 Va. 431, 437, 527 S.E.2d 406, 409 (2000)). As the Supreme Court has explained,

> subject matter jurisdiction, perhaps best understood as the "potential" jurisdiction of a court, is the authority granted to it by constitution or statute over a specified class of cases or controversies, and becomes "active" jurisdiction, the power to adjudicate a particular case upon the merits, only when various elements are present.

Ghameshlouy, 279 Va. at 388-89, 689 S.E.2d at 702-03. These elements include subject matter jurisdiction, territorial jurisdiction, notice jurisdiction, "'and *the other conditions of fact . . . which are demanded by the unwritten or statute law as the prerequisites of the authority of the court to proceed to judgment or decree*.'" Id. at 389, 689 S.E.2d at 703 (emphasis added) (quoting Bd. of Supervisors, 271 Va. at 344, 626 S.E.2d at 379).

While "'the lack of subject matter jurisdiction can be raised at any time in the proceedings, even for the first time on appeal by the court *sua sponte*,'" Porter v. Commonwealth, 276 Va. 203, 228, 661 S.E.2d 415, 427 (2008) (quoting Morrison v. Bestler, 239 Va. 166, 170, 387 S.E.2d 753, 756 (1990)), "'defects in the other jurisdictional elements generally will be considered waived unless raised in the pleadings filed with the trial court and properly preserved on appeal,'" id. at 229, 661 S.E.2d at 427 (quoting Morrison, 239 Va. at 170, 387 S.E.2d at 756).

Code § 20-96 grants a circuit court subject matter jurisdiction over "suits for annulling or affirming marriage and for divorces." In a divorce case, Code § 20-107.3 further provides the trial court with authority to make an equitable distribution of the parties' marital estate, provided certain prerequisites are met. See Code § 20-107.3(A). Before a trial court can make an equitable distribution award under Code § 20-107.3, it must "decree[] the dissolution of a marriage," "decree[] a divorce from the bond of matrimony," or receive a filing "of a certified copy of a final divorce decree obtained without the Commonwealth" as provided in Code § 20-107.3(J). Id. However, under the Supreme Court's jurisprudence distinguishing subject matter jurisdiction from the statutory prerequisites to the court's exercise of jurisdiction in a

- 17 -

particular case, we conclude that the statutory prerequisites of Code § 20-107.3(A) can be waived. If a party does not object to the trial court's authority to make an equitable distribution award based on an alleged failure to satisfy the prerequisites of Code § 20-107.3(A) in a particular divorce case, that party has waived the right to raise that objection on appeal. See Rule 5A:18 (requiring generally that an objection be "stated with reasonable certainty at the time of the ruling"); see also Porter, 276 Va. at 228-29, 661 S.E.2d at 426-27.

Wife had the opportunity below to object to the trial court's jurisdiction over equitable distribution, and she failed to do so. The Hungarian divorce decree was filed with the trial court, and if wife had any objection that specific elements of Code § 20-107.3(J) were not satisfied, she should have raised this objection below, during the equitable distribution proceedings, for the trial court's consideration. However, wife failed to raise any objection to the trial court's equitable distribution award on the grounds that the statutory prerequisites of Code § 20-107.3(A) or (J) were not met.[13] Therefore, she waived any objection she may have had to the trial court's jurisdiction over equitable distribution based on failure to comply with the prerequisites of Code § 20-107.3(A) or (J).[14] Accordingly, we will not reverse the trial court's equitable distribution award for alleged failure to satisfy the statutory prerequisites of Code § 20-107.3.

---

[13] In fact, wife did not object at all to the trial court's jurisdiction to award equitable distribution. Regarding equitable distribution, wife's counsel stated: "We're not disputing this court's ruling on the jurisdiction issue. We think you made the correct ruling on the jurisdiction issue . . . ."

[14] We express no opinion on whether the prerequisites of Code § 20-107.3 were actually met. Although the parties dispute on appeal whether all the elements of Code § 20-107.3(J) were satisfied in this case, we simply note that wife failed to make any objection challenging the trial court's jurisdiction over equitable distribution based on Code § 20-107.3(A) or (J).

2. Sufficiency of the Evidence To Prove a Gift

Husband argues that the trial court erred in finding husband gifted his separate interest in the marital residence to the marital estate. We conclude the trial court did not err in making this finding. Code § 20-107.3(A)(3)(e) provides:

> When marital property and separate property are commingled into newly acquired property resulting in the loss of identity of the contributing properties, the commingled property shall be deemed transmuted to marital property. However, to the extent the contributed property is retraceable by a preponderance of the evidence and was not a gift, the contributed property shall retain its original classification.

Here, the trial court found that husband's separate interest in the marital residence was retraceable. However, the trial court also found that husband gifted this separate interest to the marital estate. As we have noted before with respect to a similar subdivision of § 20-107.3(A)(3), "when retraceable separate property is used to purchase a gift, it no longer retains its classification as separate property." Watts v. Watts, 40 Va. App. 685, 701, 581 S.E.2d 224, 232 (2003). Wife here had the burden to prove by clear and convincing evidence that husband made a gift to the marital estate of his separate interest in the property. See Utsch v. Utsch, 266 Va. 124, 128, 581 S.E.2d 507, 508 (2003) ("The burden of proof that the transfer was a gift is upon the party seeking to establish the gift."); Cirrito v. Cirrito, 44 Va. App. 287, 303, 605 S.E.2d 268, 275 (2004) ("The burden of proof that the transfer was a gift is upon the party seeking to establish the gift by clear and convincing evidence."). Thus, wife had to prove the three elements of a gift: "'(1) the intention on the part of the donor to make the gift; (2) delivery or transfer of the gift; and (3) acceptance of the gift by the donee.'" Robinson v. Robinson, 46 Va. App. 652, 665, 621 S.E.2d 147, 154 (2005) (en banc) (quoting Theismann v. Theismann, 22 Va. App. 557, 566, 471 S.E.2d 809, 813, aff'd on reh'g en banc, 23 Va. App. 697, 479 S.E.2d

- 19 -

534 (1996)). Husband contends that wife failed to carry her burden of proving husband's donative intent.

The trial court found that three circumstances in particular supported its finding that husband intended to make a gift to the marital estate. First, the trial court noted that the property was jointly titled. See Rowe v. Rowe, 24 Va. App. 123, 137, 480 S.E.2d 760, 766 (1997) ("The fact that property is jointly titled must be considered by the trial court in determining if a gift was made, but alone, it is insufficient proof of a gift."). Second, the trial court based its finding on wife's testimony that husband and wife "used [wife's separate funds] to pay for several of our expenses, and this way we could save [husband's] salary and use it to repay our mortgage and pay for other expenses." Third, the trial court relied on husband's testimony that, "Because we loved the house so much, we decided to pay off the house."

"On appeal, we view the evidence in the light most favorable to . . . the party prevailing below." Robinson, 46 Va. App. at 660, 621 S.E.2d at 151. Furthermore, "because the trial court's classification of property is a finding of fact, that classification will not be reversed on appeal unless it is plainly wrong or without evidence to support it." Id. at 661, 621 S.E.2d at 151; see Code § 8.01-680. Based on the multiple factors listed above that the trial court considered, we cannot say the trial court's finding that husband had donative intent with respect to the marital residence was plainly wrong or without evidence to support it. The residence was jointly titled in husband's and wife's names, and the couple agreed together to pay off the mortgage because they "loved the house." They allocated the way in which they spent their funds to achieve this jointly desired goal.[15] This evidence is sufficient to support the trial court's

---

[15] Husband contends that wife's use of her separate funds is irrelevant to the issue of husband's intent in using his separate funds to purchase and pay off the mortgage on the marital residence. However, the trial court could have believed there was some sort of agreement between husband and wife as to how each of their separate funds was going to be used, so that they could ultimately achieve a common goal—the acquisition of their chosen home,

- 20 -

finding that husband intended to gift to the marital estate his separate interest in the funds that were used to purchase and pay off the mortgage on the marital residence.

### D. The Fugitive Disentitlement Doctrine

Husband's next assignment of error is that the trial court erred in failing to apply the fugitive disentitlement doctrine to wife in order to require her to testify in person before the trial court. Husband does not ask for wife's claims to be dismissed, or for her to be completely barred from participating in this action. Rather, husband simply asks that wife be required to appear in person before the trial court, arguing the trial court erred in allowing wife to participate by telephonic deposition as a substitute for live testimony.[16]

We begin by noting the absolute nature of the remedy afforded by the fugitive disentitlement doctrine. If the fugitive disentitlement doctrine applies in a particular case, the remedy afforded by the doctrine is a dismissal of a litigant's claims or a complete bar to the litigant's participation in the action. See Degen v. United States, 517 U.S. 820, 826, 828 (1996) (describing the fugitive disentitlement doctrine as "a rule forbidding all participation by the absent claimant" and "foreclosing consideration of claims on the merits"). If a lesser alternative to such an extreme remedy is available, the doctrine does not apply. Id. at 827 (reversing a trial court's application of the fugitive disentitlement doctrine to bar a criminal indictee from participating in a related civil suit, because "[t]he existence of . . . alternative means of protecting the Government's interests [in that case] show[ed] the lack of necessity for the harsh sanction of absolute disentitlement"); Matsumoto v. Matsumoto, 792 A.2d 1222, 1233 (N.J. 2002)

---

mortgage-free. Such an agreement would certainly be relevant to the issue of whether husband intended to gift his separate interest in the marital residence to the marital estate.

[16] Husband did not argue to the trial court that wife's telephonic deposition was inadmissible as a substitute for her live testimony under Rule 4:7(a). Therefore, we do not address this issue on appeal. See Rule 5A:18 (requiring generally that an objection be "stated with reasonable certainty at the time of the ruling").

(observing that the fugitive disentitlement doctrine is to be applied only "so long as nothing less than dismissal will suffice"); see Sasson v. Shenhar, 276 Va. 611, 623, 667 S.E.2d 555, 561 (2008) (noting that the fugitive disentitlement doctrine should not be applied to bar an appeal unless "no lesser sanction or remedy is available").

Husband acknowledges that a lesser remedy than dismissal or a complete bar to participation is appropriate in this case. Therefore, he cannot successfully argue that the trial court erred in failing to apply the fugitive disentitlement doctrine to wife. Rather, husband's argument, as he states it more precisely, is that the trial court erred in failing to apply the rationales underlying the fugitive disentitlement doctrine to require wife to appear before the trial court in person instead of permitting her to participate via telephonic deposition.

We decline to adopt any rule requiring trial courts to impose particular remedies or sanctions in specific cases, apart from the general requirement that a trial court's decision regarding remedies and sanctions not constitute an abuse of its discretion. See Oxenham v. Johnson, 241 Va. 281, 287, 402 S.E.2d 1, 4 (1991) ("[W]e apply an abuse-of-discretion standard in reviewing a trial court's award or denial of a sanction."). "Fugitive disentitlement is a doctrine that springs out of the inherent power of courts to enforce their judgments and protect their dignity." Matsumoto, 792 A.2d at 1227. The fugitive disentitlement doctrine thus *permits* radical sanctions against fugitive litigants in extreme circumstances, but it does not serve as the basis for erecting a complex pyramid of varying degrees of particular sanctions and remedies that *must* be imposed in specific situations. We hold that the fugitive disentitlement doctrine and its various rationales do not grant a non-fugitive party a right to the imposition of any particular lesser remedy in a specific case. If the fugitive disentitlement doctrine *per se* does not apply— with its extreme remedy—the decision whether to impose any particular lesser remedy against a

- 22 -

fugitive litigant in a specific case rests squarely within the sound discretion of the trial court in the case before it.

The question before us thus becomes whether the trial court abused its discretion in failing to give husband the precise lesser remedy he requested. We cannot say on the facts before us that the trial court abused its discretion in failing to order wife to appear in person to testify. The trial court was within its discretion in deciding what specific measures it did or did not need to take to "enforce [its] judgments and protect [its] dignity."[17] Matsumoto, 792 A.2d at 1227. We therefore affirm the trial court's decision to permit wife to participate via telephonic deposition instead of requiring her to appear in person.

### E. The QDRO and the Trial Court's Final Decree

In his final assignment of error, husband contends that the trial court erred by entering a Qualified Domestic Relations Order (QDRO) that altered the final decree's valuation of the marital share of husband's GE Savings and Security Plan (the "Plan").[18] In its final decree, the trial court stated:

> Ms. Prizzia shall receive 40% of the marital share of Mr. Prizzia's
> GE Savings and Security Plan, namely that which accrued between
> August 29, 1999 and December 31, 2002, plus any interest,

---

[17] As a relevant matter, we note that wife has not violated any order of the trial court. See Morrison v. Morrison, 57 Va. App. 629, 639, 704 S.E.2d 617, 621 (2011) (noting that even though a mother had an outstanding warrant for her arrest from a Michigan court, as well as a federal indictment against her for parental kidnapping, she was "not a fugitive from any judgment entered against her in this Commonwealth").

[18] Neither party has assigned any error on appeal to the language of the final decree itself. Therefore, the issue before us is simply whether the QDRO properly effectuated the language of the final decree defining the Plan's marital share. See Code § 20-107.3(K) (giving the trial court "the continuing authority and jurisdiction to make any additional orders necessary to *effectuate and enforce* any order entered pursuant to [§ 20-107.3]" (emphasis added)); Code § 20-107.3(K)(4) (permitting modification of a final decree's division of a pension plan "only for the purpose of establishing or maintaining the order as a qualified domestic relations order or to revise or conform its terms so as to *effectuate the expressed intent* of the order" (emphasis added)).

earnings, gains and losses on her share from December 31, 2002 until the date of distribution. The division shall be by a QDRO.

The QDRO[19] assigned to wife "nine percent (9%) of the current market value of [husband's] account."

The trial court arrived at this nine percent figure by utilizing the "coverture fraction" that is typically applied to defined benefit plans. However, husband's Plan is not a defined benefit plan, but a defined contribution plan. As we have previously indicated, the coverture fraction is an inappropriate method to determine the marital share of a defined contribution plan. Mann v. Mann, 22 Va. App. 459, 465 n.6, 470 S.E.2d 605, 607 n.6 (1996) ("Applying [the coverture] fraction to a defined contribution plan could lead to incongruous results, and such an approach is not generally used. Proration of a defined contribution plan is typically accomplished by tracing separately contributed funds." (citation omitted)); see also Brett R. Turner, Equitable Distribution of Property § 6:24 (3d ed. 2005) (explaining why "[i]t is generally error to classify a defined contribution retirement plan using the time-based coverture fraction used to classify defined benefit plans," and why "[a]pplication of a time-based coverture to defined contribution plans creates a significant risk of reaching unjust results").

The trial court's final decree defined the Plan's marital share as the amount of money that accrued between two specific dates—"that which accrued between August 29, 1999 and December 31, 2002." Thus, the final decree was concerned with the amount of money that *actually accrued* during a certain time period. In contrast, the coverture fraction is concerned solely with proportions of time, completely disregarding what may actually accrue during any particular period of time. Since the coverture fraction is based on temporal proportions rather

---

[19] The trial court entered two different QDROs, one for each of husband's two retirement accounts with GE. Husband has assigned error only to the QDRO relating to his GE Savings and Security Plan. Thus, this is the QDRO to which this opinion refers.

than on what actually accrued in an account during a particular time, the trial court effectively altered the terms of the final decree when it entered the QDRO. Thus, the trial court's use of the coverture fraction in its QDRO was not an appropriate method for "effectuat[ing] the expressed intent" of its final decree. See Code § 20-107.3(K)(4).

"'We have previously held that [QDRO] orders that alter critical terms of the [equitable distribution order], such as timing or amount of payments, exceed the authority granted under Code § 20-107.3(K)(4).'" Turner v. Turner, 47 Va. App. 76, 80, 622 S.E.2d 263, 266 (2005) (alterations in original) (quoting Hastie v. Hastie, 29 Va. App. 776, 781, 514 S.E.2d 800, 803 (1999)). The method for valuing the marital share of a defined contribution plan is certainly a critical term of an equitable distribution order. Here, the trial court's use of a coverture fraction in the QDRO altered the final decree's valuation of the Plan's marital share. Therefore, we vacate the specific provision of the QDRO assigning nine percent of the Plan's overall value to wife, and we remand the matter to the trial court for entry of a QDRO reflecting a proper valuation of the marital share of the Plan, as that marital share was defined in the trial court's final decree.

## F. Deviation from Statutory Child Support Guidelines

We turn now to address wife's additional assignments of error. Wife's first assignment of error is that the trial court erred in allowing husband a "credit" against his child support obligation for payment of educational expenses on behalf of the child. The trial court awarded child support according to the statutory guidelines, see Code § 20-108.2, but also granted husband "a credit for private school tuition and English lessons" for which it found husband had already paid certain amounts. Wife contends it was error for the trial court to grant husband this credit, arguing that the trial court failed to make necessary written findings. We agree.

Although wife refers to this "credit" as a credit for non-conforming payments, we note that this was not a credit for non-conforming payments made after a child support award had already been entered.[20]  Rather, the "credit" here functionally altered the amount of child support that had been calculated pursuant to the statutory guidelines.  Thus, we determine the validity of this credit by analyzing whether it satisfied the statutory requirements for a deviation from the guideline amount.  Code § 20-108.1(B) requires a trial court that deviates from the guidelines to "make written findings . . . that the application of [the] guidelines would be unjust or inappropriate in a particular case."  See Mayers v. Mayers, 15 Va. App. 587, 592, 425 S.E.2d 808, 811 (1993) ("We have repeatedly held that whenever a child support award varies from the amount of support set forth in the guidelines, the trial court must make written findings of fact explaining why application of the guidelines would be 'unjust or inappropriate.'").

Here, the trial court failed to make the written findings required by Code § 20-108.1(B).[21] Moreover, the final decree recites that the amount of child support "is based on calculations pursuant to the statutory guidelines" and that "[husband's] request for a deviation from the

---

[20] We observe that there can be no non-conforming payments unless there is a child support award already in place.  See Jones v. Davis, 43 Va. App. 9, 14, 595 S.E.2d 501, 503 (2004) (recognizing that allowing a credit for non-conforming payments constitutes an "exception[] to the statutory limitations on retroactive modification of past due child support payments"); Gallagher v. Gallagher, 35 Va. App. 470, 476, 546 S.E.2d 222, 225 (2001) (en banc) ("'A court may, when equitable and under limited circumstances, allow a party credit for non-conforming support payments, provided that the non-conforming support payment substantially satisfies the purpose and function of the support award, and to do so does not vary the support award.'" (citation omitted) (quoting Commonwealth v. Skeens, 18 Va. App. 154, 158, 442 S.E.2d 432, 435 (1994))).  Here, there was no prior child support award in existence. Therefore, husband's payments for the child's educational expenses cannot be characterized as non-conforming child support payments.

[21] Husband argues that the trial court explained its decision orally from the bench. However, this portion of the transcript was not incorporated by reference into the final decree, and thus it fails to satisfy the requirement of Code § 20-108.1(B) that the written findings be contained "in the order" or "incorporated by reference."

- 26 -

statutory guidelines is denied."[22]  The trial court was asked to deviate from the guidelines, and it expressly refused to do so.  Yet, in awarding husband what it termed a "credit" for the tuition payments husband had previously made, the trial court effectively reduced the amount of child support as calculated under the guidelines.  Thus, whatever the reduction was called, it amounted to a deviation from the guideline amount.  Since the trial court failed to follow the statutory requirements for deviating from the guideline amount, we reverse its decision to reduce the child support award by the "credit" it granted to husband.

### G.  Exclusion of Day-Care Expenses from Child Support Calculation

Wife's second assignment of error is that the trial court erred in failing to add work-related day-care expenses to the child support calculation.  We find no error in the trial court's ruling on this issue.

Code § 20-108.2(F) provides:  "Any child-care costs incurred on behalf of the child or children due to employment of the custodial parent *shall be added* to the basic child support obligation."  This language is mandatory.  However, the trial court here held that the mere testimony of wife as to what her day-care expenses were for the child, without any further evidence, was insufficient proof of the appropriate amount of day-care expenses to be added to the basic child support obligation.  The trial court noted the lack of evidence showing that the amount to which wife testified was reasonable in comparison to alternative day-care centers.  Moreover, the trial court observed that the evidence did not show whether the child was in public school, which provided a free day-care option.  The trial court also noted that wife's testimony indicated she was paying a nanny a higher hourly rate than wife herself was earning.  In light of this evidentiary dilemma, the trial court was certainly free to conclude that wife had not carried

---

[22] Husband's request for a deviation from the guidelines was based on reasons not before us in this appeal.

her burden of production in demonstrating the appropriate amount of day-care expenses that should have been added to the basic support obligation.

Simply because a statute requires inclusion of certain expenses in a child support award, it does not follow that the party seeking the inclusion of those expenses does not have the burden to produce sufficient credible evidence showing the appropriate amount of those expenses. Cf. Bowers v. Bowers, 4 Va. App. 610, 617, 359 S.E.2d 546, 550 (1987) (observing that even under a mandatory statute, a litigant still carries "the burden to present evidence sufficient for the court to discharge its duty"). Thus, we find no error in the trial court's exclusion of day-care expenses from its child support calculation.

### H. Condition Imposed on Wife's Receipt of Her Equitable Distribution Award

Wife's final assignment of error is that the trial court erred in ordering that her equitable distribution award be held in escrow until she complied with the Hungarian court's visitation order. We agree that this was error.

"Jurisdiction in divorce suits is purely statutory, and it cannot be acquired by the courts inferentially or through indirection. When the General Assembly confers jurisdiction on divorce courts, it accomplishes the purpose using clear, detailed language." Stroop v. Stroop, 10 Va. App. 611, 616, 394 S.E.2d 861, 864 (1990) (citing Johnson v. Johnson, 224 Va. 641, 645, 299 S.E.2d 351, 353-54 (1983)). Thus, "[a] divorce court's judgment must not exceed the power given it, nor may it claim inherent power to employ a mode or procedure which is not clearly provided by law." Id.

Husband contends that Code § 20-107.3(E) provides the requisite statutory authority for the trial court's order imposing a condition on wife's receipt of her equitable distribution award. Code § 20-107.3(E) gives the trial court authority to determine "[t]he amount of any division or transfer of jointly owned marital property, and the amount of any monetary award, the

- 28 -

apportionment of marital debts, and the method of payment." Husband argues that the trial court's order was justified under its authority to determine the "method of payment" of wife's equitable distribution award. However, we note that although the language of Code § 20-107.3(E) permits a trial court to determine the *method* of payment of an equitable distribution award, it does not permit a trial court to set *conditions* of payment that are unrelated to the award itself. Without express statutory authorization to condition payment of an equitable distribution award upon compliance with child custody and visitation orders, a trial court is without authority to impose such a condition. Cf. Stroop, 10 Va. App. at 616, 394 S.E.2d at 863-64 (holding that although Code § 20-107.3(C) authorizes the transfer of ownership of jointly owned marital property, it "does not empower the trial court to require the transferor to await payments at some future date"). Because Code § 20-107.3(E) does not grant a trial court the authority to impose unrelated conditions on one party's right to receive her equitable distribution award, we reverse the trial court's imposition of such a condition in this case.

## III. CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

Affirmed in part,<br>reversed in part,<br>and remanded.