COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Alston and Decker
Argued at Richmond, Virginia

PUBLISHED

MICHAEL A. OLEY

v.        Record No. 1857-13-2

LISA S. BRANCH

OPINION BY
JUDGE ROBERT J. HUMPHREYS
SEPTEMBER 9, 2014

FROM THE CIRCUIT COURT OF GOOCHLAND COUNTY
Timothy K. Sanner, Judge

Michael Oley, *pro se*.

No brief or argument for appellee.

Michael A. Oley ("Oley," "father," or "plaintiff") appeals a child support order entered

by the Goochland County Circuit Court (the "circuit court") on August 27, 2013 addressing Lisa

S. Branch's ("Branch," "mother," or "defendant") monthly child support obligations.  He asserts

seven assignments of error in support of his appeal.  His first, second, and third assignments of

error all allege that the circuit court erred as a matter of law in determining that Branch's

personal injury settlement annuity, Pell Grant, and "free house" did not constitute income for the

purpose of calculating child support.  Oley's fourth assignment of error is that the circuit court

erred as a matter of law in refusing to grant him credit for childcare expenses.  His fifth and sixth

assignments of error are that the circuit court abused its discretion in declining to award him

child support for the children's private school tuition and in declining to award him child support

arrearages.  Finally, in his seventh assignment of error, Oley asserts that he was denied due

process because he did not receive a fair hearing in the circuit court.

Each of Oley's arguments are addressed in turn below. For the reasons that follow, the judgment of the circuit court is affirmed in part, and reversed and remanded in part.

## I. BACKGROUND

Pursuant to Oley's and Branch's custody agreement, Oley is the custodial parent of their three minor children—ages nine, eleven, and fourteen. Oley and Branch have a fourth child who turned eighteen several months before the circuit court's August 27, 2013 child support order that is the focus of this dispute. The issues before this Court relate solely to the circuit court's decisions regarding Branch's child support obligations, and therefore the facts below are relevant only to those disputes.

### A. The Parties' Gross Monthly Incomes and Child Support Obligations

Branch was unemployed and enrolled in school to become a dental assistant at the time of the child support hearing. The circuit court found that the evidence allowed it to impute income to Branch based on her most recent employment. It concluded that Branch was "capable of earning at least the rate of $8.50 an hour based on her [former] employment at Chick-fil-A,"— resulting in a monthly income of $1,462. Consequently, the circuit court fixed Branch's gross monthly income at $1,462.

Oley argued that Branch had other sources of "income" that the circuit court was required to consider when calculating her gross income pursuant to the statutory guidelines. Branch receives annuity payments stemming from a personal injury settlement from a 1987 car accident she was in when she was sixteen years old. She was awarded lifetime monthly payments of $1,000 as well as four $100,000 lump sum payments that were made in 1997, 2002, 2007, and 2012. The circuit court found that Branch's personal injury settlement annuity was excluded from being considered part of her gross income. Relying on this Court's decision in Whitaker v. Colbert, 18 Va. App. 202, 442 S.E.2d 429 (1994), the circuit court reasoned that because the

settlement itself was not apportioned as to loss of income or lost wages, an annuity stemming from that settlement was not intended to be included in the statutory definition of gross income.

Branch also received a $5,500 Federal Pell Grant ("Pell Grant") to go back to school. Oley argued that the circuit court should include her Pell Grant as well as $1,200 in "free housing"—the cost of the rent she paid before moving in with her mother—because it is a "gift" she receives by living with her mother free-of-charge. Without stating any reasons for doing so, the circuit court did not include either item in its computation of Branch's gross income.

With respect to Oley's monthly income, Oley owns a startup Internet business that he runs from his home. Prior to that, he owned a roofing and construction company that he "shuttered" in 2009 due to changes in the economic climate. The circuit court noted that Oley's bank account appeared to have large sums of money and he had recently purchased a $60,000 recreational vehicle using sums from those accounts. Oley attributed the money in his accounts to his past earnings and the proceeds from the sale of his home. The circuit court noted that it found Oley's "testimony regarding his income to be very suspicious." However, despite its reservations, the circuit court concluded that "[i]t appears that the only evidence that we really have is that [Oley] made $500, essentially, over the first four months of this year." The circuit court fixed Oley's gross monthly income at $125.

The circuit court concluded that pursuant to the statutory schedule the presumptive support Branch should pay Oley each month for their three minor children was $1,711.20.[1] However, the circuit court found that a deviation from the guidelines was warranted because "applying the guidelines amounts would work at a substantial inequity in this case." Because

---

[1] The $1,711.20 presumptive support amount was calculated according to the schedule contained in Code § 20-108.2(B) by considering the fact that the parties had three children, Branch's income was $1,462, Oley's income was $125, and Oley was paying $1,313 per month for the children's health insurance.

Branch was only capable of earning $1,462 per month, the guideline amount of $1,711.20 would require "her to pay something that she doesn't have." In considering a deviation from the guidelines, the circuit court additionally noted that "the evidence establishes that the father appears to have plenty of money to meet the needs of his children."

Based on its finding that a deviation from the guidelines was appropriate, the circuit court ordered Branch to pay Oley $453.75 per month from May 1, 2011 until March 1, 2013 in child support for their four children—ending the date of their fourth child's eighteenth birthday. After March 1, 2013, the circuit court ordered Branch to pay Oley $400 a month in child support for their remaining three minor children.

### B. Childcare Expenses

Oley runs his startup Internet company mainly from his home, but occasionally he works from a "virtual office" in Innsbrook. The three minor children attend school every weekday from 8:15 a.m. until 3:10 p.m. Oley testified that he requires childcare from 8:30 a.m. to 5:00 p.m. His current nanny works those hours, and sometimes longer, for $400 per week. According to Oley, the nanny's responsibilities included "cooking, cleaning, laundry, [and] a multifaceted amount of things." The children are home only approximately two hours out of the nanny's 8:30 a.m. to 5:00 p.m. workday.

The circuit court found that the evidence demonstrated that the nanny's presence was more akin to "taking a role of a mother" rather than providing childcare that "simply allow[s] [Oley] to work." Noting that it found Oley's testimony "not particular[ly] credible," the circuit court concluded that the evidence did not demonstrate that the nanny's responsibilities had "anything to do with work-related day care." Therefore, the circuit court denied Oley's request for childcare support because there was "insufficient evidence to find that [he] has legitimate

- 4 -

*work related* child care expenses to be considered in accordance with the guidelines."  (Emphasis added).

### C.  Private School Tuition

Oley's and Branch's three minor children currently attend a private school named Salem Christian School.  Their combined yearly tuitions total $15,000.  The children have not always attended Salem Christian—they were home schooled for "a couple of years" and attended public school for "a couple of years."  The children re-entered Salem Christian after a period of home schooling.  The parties' custody agreement was only that the children would not be home schooled; however, the agreement did not specifically mandate their attendance at Salem Christian.  Branch does not object to the children attending Salem Christian.

The circuit court denied Oley's motion to require Branch to pay for the children's private school tuition because it found that Oley's evidence failed to establish that "there is a need for the children to attend private school," "that the funds and needs otherwise cannot be met in public school," and "that the mother has the ability to pay for it."

### II.  ANALYSIS

### A.  "Gross Income" under Code § 20-108.2(C)

Statutory child support guidelines were designed "to assure that both the child's needs and the parent's ability to pay are considered in determining the amount of support awards." Richardson v. Richardson, 12 Va. App. 18, 20, 401 S.E.2d 894, 895 (1991).  Code § 20-108.2(A) establishes a rebuttable presumption that an application of the schedule contained in the statute results in the correct amount of child support to be awarded under the circumstances.  Only *after* determining the presumptive amount of support according to the schedule, may the circuit court adjust the support amount based on the factors found in Code § 20-108.1.  Howe v. Howe, 30 Va. App. 207, 214, 516 S.E.2d 240, 244 (1999).  Any "[d]eviations from the presumptive

support obligation must be supported by written findings which state why the application of the guidelines in the particular case would be unjust or inappropriate." Id.

Thus, "the starting point for a trial court in determining the monthly child support obligation of a party is the amount as computed by the schedule found in Code § 20-108.2(B)." Richardson, 12 Va. App. at 21, 401 S.E.2d at 896. This amount "varies according to the combined gross income of the parties and the number of children involved." Id. Code § 20-108.2(C) defines "gross income" as:

> *all income from all sources, and shall include, but not be limited to*, income from salaries, wages, commissions, royalties, bonuses, dividends, severance pay, pensions, interest, trust income, annuities, capital gains, social security benefits except as listed below, workers' compensation benefits, unemployment insurance benefits, disability insurance benefits, veterans' benefits, spousal support, rental income, gifts, prizes or awards.

(Emphasis added). Subsection (C) then enumerates specific sources of income that are categorically excluded from being considered part of a party's "gross income." See, e.g., Code § 20-108.2(C)(1)-(4). "No additions or subtractions from the gross income, as defined in Code § 20-108.2(C), even if otherwise valid considerations, may be made *before* this figure is determined." Richardson, 12 Va. App. at 21, 401 S.E.2d at 896.

Oley asserts in his first, second, and third assignments of error that the circuit court erred as a matter of law by excluding certain sources of funds in its computation of Branch's "gross income." Specifically, he argues the following items are "income" as defined by Code § 20-108.2(C): (i) Branch's personal injury settlement annuity payments; (ii) the "free housing" Branch receives as a "gift" from her mother; and (iii) Branch's Pell Grant. Whether the circuit court correctly concluded that those items are not "income" as defined by Code § 20-108.2(C) presents a question of law that we review *de novo*. See Navas v. Navas, 43 Va. App. 484, 487, 599 S.E.2d 479, 480 (2004).

### i.  Personal Injury Settlement Annuity

Oley first argues that the circuit court erred by failing to include Branch's annuity payments, originating from a 1987 personal injury settlement, in the computation of her "gross income."  We disagree.

This Court has previously considered whether personal injury settlements are "income" within the scope of Code § 20-108.2(C).  In Whitaker, this Court upheld a circuit court's refusal to treat a father's personal injury settlement as income.  18 Va. App. at 204, 442 S.E.2d at 431.  This Court reasoned that because the definition of "gross income" includes "capital gains," and "capital gains are by their nature profits, not returns of capital," the General Assembly intended that Code § 20-108.2(C) only "applies to income, *not capital recoupment*."  Id. at 204-05, 442 S.E.2d at 431 (emphasis added).  In the case of personal injury settlements, the evidence must prove that the settlement generates income or profit rather than merely makes the recipient whole from damages incurred.  Id.  Because the father's settlement was not apportioned as to pain and suffering, permanent injury or disability, lost wages, lost capacity, or future medical needs, "it would be speculative at best as to how to attribute any part of that settlement to prior lost wages as opposed to the other elements of damages."  Id. at 205, 442 S.E.2nd at 431.  Consequently, the Whitaker Court held that in that particular case, the evidence did not prove that the settlement generated *income* for the father and was not mere capital recoupment and therefore the settlement could not be considered in awarding child support obligations.

Oley argues that because Branch receives her personal injury settlement in the form of an annuity, Branch's payments are "income" under subsection (C).  The definition of "gross income" contained in Code § 20-108.2(C) specifically includes "income from . . . annuities."  The plain language of the statute requires that in order to be considered when calculating child

support obligations, annuities—or any of the other enumerated items in Code § 20-108.2(C)—must *generate income* to the recipient.

Dispersing Branch's personal injury settlement in the form of an annuity does not change the underlying character of the source—a personal injury settlement. Consequently, the mere fact that Branch receives her personal injury settlement in the *form* of an annuity does not render our holding in Whitaker inapplicable. This Court's holding in Whitaker does not stand for the proposition that personal injury settlements are categorically excluded from being considered income under subsection (C). Rather Whitaker explains under what circumstances a personal injury settlement may or may not be considered income. In order for a personal injury settlement to be considered income pursuant to Code § 20-108.2(C), the evidence must prove that a defined portion of the settlement *generates income* to the recipient rather than merely compensates for a past injury.

In this case, like in Whitaker, Branch's settlement is not apportioned as to the nature of the damages that involve the settlement. There is nothing in the record that indicates that the settlement involved compensation for lost wages or lost income—particularly in light of the fact that Branch was a minor at the time of the accident. The circuit court concluded that Branch's settlement payments, even if paid out over many years in the form of an annuity, were capital *recoupments* intended to make "a badly injured child whole." The record supports the circuit court's determination that the evidence did not prove that the annuity payments generated any income to Branch. Therefore, the circuit court did not err in excluding Branch's personal injury payments when computing her gross income pursuant to Code § 20-108.2(C) simply because they took the form of an annuity.

## ii. Free Housing

Oley next argues that the circuit court erred by failing to include the monetary value of Branch's "free housing" when it calculated her gross income. He asserts that the "free housing" is a "gift" from her mother, and is therefore "income" as defined by Code § 20-108.2(C). We disagree.

Oley relies on Carmon v. Department of Social Services, 21 Va. App. 749, 467 S.E.2d 815 (1996), to support his proposition that free room and board *must* constitute nonmonetary income. However, Oley fails to read the holding in Carmon within its factual context. In Carmon, this Court found that free room and board were considered "income" under Code § 20-108.2(C) because Carmon received them in exchange for her services—collecting rent, cleaning vacated rooms, etc. 21 Va. App. at 754-55, 467 S.E.2d at 818. The Court found that the free lodging compensation she received in exchange for services was "nonmonetary income" that was within the scope of Code § 20-108.2(C). Id. Because the value of the room and board Carmon received as compensation for her services was $300, this Court affirmed the circuit court's finding that her income was $300. Id. In this case, the holding in Carmon is inapplicable because there is nothing in the record establishing that Branch received anything in exchange for her room at her mother's house.

Oley argues that Branch's "free housing" is a gift from her mother. Although "the statute defines gifts as income," Howe, 30 Va. App. at 214, 516 S.E.2d at 244, allowing someone to live with you is not a "gift." "A gift is property that is voluntarily transferred to another without compensation." Goldhamer v. Cohen, 31 Va. App. 728, 736, 525 S.E.2d 599, 603 (2000) (citing Black's Law Dictionary 696 (7th ed. 1999)). Here there is no property being transferred. Moreover, there is nothing in the record to establish the value of Branch's room at her mother's house. Oley asserts that the value of the room is $1,200 per month because her previous monthly

rent was $1,200 per month. In other words, Oley argues that the "income" is the money Branch

saves by living with her mother rather than living in her previous apartment. Branch's decision

to live with her mother amounts only to a decrease in spending, and is not property voluntarily

transferred to her by her mother, nor does it generate "income" as defined by Code

§ 20-108.2(C). Therefore, the circuit court did not err in excluding Branch's housing

arrangements when calculating her gross income.

<u>iii. Pell Grant</u>

Oley next argues that the circuit court erred by failing to include Branch's $5,500 Pell

Grant when it calculated her gross income. Whether federal educational grants are "income" for

the purposes of calculating child support is a matter of first impression in Virginia.[2]

---

[2] A select number of other jurisdictions have addressed whether educational grants are income for the purposes of calculating child support; however, those courts' determinations all turned on the language of each state's specific statutory language. <u>See, e.g.</u>, <u>In re Marriage of Syverson</u>, 931 P.2d 691, 698 (Mont. 1997) (concluding that money from the mother's Pell Grant that exceeded her tuition bill should be considered gross income because the statute defined gross income as "grants, scholarships, third party contributions or other money *intended to subsidize the parent's living expenses* and which are not required to be repaid at some later date" (quoting Mont. Admin. R. § 46.30.1513(2)(e))); <u>In re Marriage of Mellott</u>, 93 P.3d 1219, 1221-22 (Kan. Ct. App. 2004) (concluding that tuition reimbursements from an employer not exceeding cost of tuition were not income for child support purposes because under the statutory guidelines income is only imputed to a noncustodial parent when "a parent receives significant in kind payments *that reduce personal living expenses* as a result of employment, such as a company car, free housing, or reimbursed meals," and tuition reimbursement did not equate to living expenses reimbursement); <u>Thibadeau v. Thibadeau</u>, 441 N.W.2d 281, 285 (Wis. 1989) (concluding that the trial court erred by considering a federal educational grant as gross income because the state statute defined gross income as income from any source "unless excluded by law," and the federal tax code excludes educational grants from gross income calculations); <u>McKyer v. McKyer</u>, 632 S.E.2d 828, 836 (N.C. Ct. App. 2006) (remanding for further factual findings because the state statutory guidelines specifically excluded from the definition of income "benefits received from means-tested public assistance programs" and the trial court had made no findings as to whether the school grant was a benefit from a means-tested public assistance program, whether it significantly reduced the father's personal living expenses, or whether there are any limits upon the use of the funds).

- 10 -

The Pell Grant Program provides financial assistance to students attending eligible intuitions of higher education to help subsidize their post-secondary education costs.[3] Trustees of the Cal. State Univ. v. Riley, 74 F.3d 960, 962 (9th Cir. 1996); see also 34 C.F.R. § 690.1 ("The Federal Pell Grant Program awards grants to help financially needy students meet the cost of their postsecondary education."). Educational costs are not limited to tuition but may include other supplemental costs such as room and board, books, or services. See, e.g., 20 U.S.C. § 1070a(e) ("Any disbursement allowed to be made by crediting the student's account shall be limited to tuition and fees and, in the case of institutionally owned housing, room and board. The student may elect to have the institution provide other such goods and services by crediting the student's account.").

"Under Code § 20-108.2(C), gross income includes 'all income from all sources,' and *unless specifically excluded, any income from any source is subject to inclusion*." Frazer v. Frazer, 23 Va. App. 358, 378, 477 S.E.2d 290, 299-300 (1996) (emphasis added) (quoting Code § 20-108.2(C)) (holding that because Code § 20-108.2(C) did not specifically exclude voluntary contributions to retirement plans from the definition of gross income, the contributions should be included in gross income for child support purposes). While Code § 20-108.2(C) does not specifically enumerate educational grants, such as the Pell Grant, under its definition of "gross income," there is nothing contained in the language of the statute, nor in this Court's precedent, that explicitly or implicitly *excludes* federal educational grants from being considered income.

Code § 20-108.2(C)'s definition of gross income specifically includes other governmental assistance programs, such as "social security benefits." However, subsection (C)

---

[3] Notably, a Pell Grant is distinguishable from a student loan because a Pell Grant recipient does not need to repay the grant.

explicitly provides that gross income "shall *not* include" "supplemental security income benefits" or "public assistance and social services as defined in Code § 63.2-100." Code § 20-108.2(C)(1) and (2) (emphasis added). A Pell Grant does not meet any of those enumerated exclusions. If the General Assembly intended to exclude additional government subsidies, such as educational grants, it would have specifically articulated those exclusions. See Commonwealth v. Brown, 259 Va. 697, 704-05, 529 S.E.2d 96, 100 (2000) ("The maxim of statutory construction *expressio unius est exclusio alterius* . . . provides that where a statute speaks in specific terms, an implication arises that omitted terms were not intended to be included within the scope of the statute."). Because the General Assembly specifically enumerated certain governmental assistance programs that "shall not" be considered "gross income," non-enumerated programs, such as federal educational grants, are therefore subject to inclusion.

Therefore, because Code § 20-108.2(C) does not specifically exclude federal education grants, like the Pell Grant in this case, they are subject to inclusion. Consequently, the circuit court erred by not considering Branch's Pell Grant when it calculated her gross income. Accordingly, we remand this case to the circuit court to recalculate the parties' presumptive monthly support obligations in accordance with this opinion before it makes any deviations from the guidelines based on the factors found in Code § 20-108.1.[4]

---

[4] Notably, Code § 20-108.1(B)(11) provides a basis for deviation in considering the "[e]arning capacity, obligations, financial resources, and special needs of each parent." Consequently, merely because a particular source of income is included or excluded in the party's "gross income," the circuit court retains the discretion to consider those additional resources as a basis for deviation if strict adherence to the guidelines "would be unjust or inappropriate in a particular case." Code § 20-108.1(B).

B. Childcare Expenses

Oley next argues that the circuit court erred as a matter of law by failing to award him childcare expenses.

Code § 20-108.2(F) provides that: "Any child-care costs incurred on behalf of the child or children due to employment of the custodial parent shall be added to the basic child support obligation." While Oley is correct that this Court in Prizzia v. Prizzia, 58 Va. App. 137, 707 S.E.2d 461 (2011), stated that the language in Code § 20-108.2(F) "is mandatory," he ignores the final holding in that case. In Prizzia, this Court affirmed the trial court's decision to exclude day care expenses from its support award because the custodial parent failed to offer sufficient evidence demonstrating the appropriate amount of day care expenses. Id. at 171, 707 S.E.2d at 478. Specifically, there was insufficient proof that the amount requested was reasonable in comparison to alternative day care centers and that free day care provided by public schools was unavailable to the child. Id. at 171, 707 S.E.2d at 477-78. Additionally, the custodial parent testified that she was paying the nanny a higher hourly rate than she was earning herself. Id. In affirming the trial court, this Court noted that "[s]imply because a statute requires inclusion of certain expenses in a child support award, it does not follow that the party seeking the inclusion of those expenses does not have the burden to produce sufficient credible evidence showing the appropriate amount of those expenses." Id. at 171-72, 707 S.E.2d at 478.

In this case, the circuit court found that Oley failed to produce credible evidence that the childcare costs he was seeking were employment related. The nanny worked from 8:30 a.m. to 5:00 p.m. cooking, cleaning, and doing laundry while the children were in school 8:15 a.m. to 3:00 p.m. and Oley was working from home. Code § 20-108.2(F) only requires that the custodial parent receive child support for childcare costs incurred "due to employment of the custodial parent." Here, the circuit court was free to conclude that Oley failed to prove that the nanny was

necessary due to his employment or that he failed to demonstrate the requested amount of day care expenses was appropriate under the circumstances. Therefore, we find that the circuit court did not abuse its discretion in denying Oley's request for childcare costs.

### C. Private School Tuition

Oley next argues that the circuit court abused its discretion in declining to deviate from the statutory guidelines by including the children's private school tuition as part of Branch's child support obligation.

"Implicit in the statutory scheme is that educational expenses are included in the presumptive amount of child support as calculated under the Code." Smith v. Smith, 18 Va. App. 427, 435, 444 S.E.2d 269, 275 (1994). However, as explained *supra*, it is within the circuit court's discretion to deviate from the presumptive support guidelines based on the factors found in Code § 20-108.1(B) as they affect the obligation of each party, the ability of each party to provide child support, and the best interests of the child. Code § 20-108.1(B). One of the factors providing grounds for deviating from the statutory presumption specifically includes direct payments ordered by the court for "educational expenses." Code § 20-108.1(B)(6). The circuit court may order a parent "to pay for private educational expenses, even though such expenses exceed the guidelines, when there is a demonstrated need for the child to attend private school *and* the parent has the ability to pay." Ragsdale v. Ragsdale, 30 Va. App. 283, 295, 576 S.E.2d 689, 704 (1999) (emphasis added) (citing Solomond v. Ball, 22 Va. App. 385, 391, 470 S.E.2d 157, 160 (1996)).

In determining whether there is a demonstrated need for the child to attend private school, "the trial court must consider 'factors such as the availability of satisfactory public schools, the child's attendance at private school prior to the separation and divorce, the child's special emotional or physical needs, religious training, and family tradition.'" Joynes v. Payne,

36 Va. App. 401, 424, 551 S.E.2d 10, 21 (2001) (quoting Solomond, 22 Va. App. at 391, 470 S.E.2d at 160).

In this case the circuit court declined to require Branch to pay the children's private school tuition because, after having "reviewed the Eisert case," the court found that Oley's evidence failed to establish "there [wa]s a need for the children to attend private school and that the funds and needs otherwise cannot be met in public school." Additionally, the circuit court found that Oley failed to establish "that the mother has the ability to pay for it." In Eisert v. Eisert, No. 2990-06-4, 2008 Va. App. LEXIS 134, at *18-19 (Va. Ct. App. Mar. 18, 2008), an unpublished decision of this Court, we found that because the children's need to attend private school was not in dispute the circuit court "was only required to explain in writing why it was 'unjust or inappropriate' for wife to share in the cost of tuition." Id. at *19. This Court concluded that the circuit court did not abuse its discretion in ordering the husband to pay the full cost of tuition because there was a large disparity in the parties' disposable incomes. Id.

In this case, unlike Eisert, the parties did not affirmatively agree that private school attendance was *necessary*. Although Oley asserts that they agreed private school was in the best interest of the children, the record in the light most favorable to the party that prevailed in the court below reflects that Branch merely had no objection to the children attending Salem Christian School. The parties' agreement was only that the children would not be home schooled. The circuit court did not find any evidence in the record that demonstrated a need to attend private school or that the children's needs could not adequately be met in public school. The children had attended public school in the past and had also been home schooled. There was no evidence as to any special emotional or physical needs of the children that would require them to attend private school. Nor was there any evidence supporting the children's need to attend private school due to religious training.

- 15 -

Irrespective of a demonstrated need for private school attendance, the circuit court also found that the evidence did not establish that Branch had the ability to pay for private school tuition. In fact, the circuit court concluded that Branch did not even have the ability to pay the presumptive monthly support amount according to the child support schedule nor any excess amount for private school tuition.

Here, the circuit court did not order Oley to pay for the children's tuition, but rather concluded that Branch did not have the ability to contribute to the cost nor was there a demonstrated need to order her to contribute. In other words, the circuit court merely concluded that Oley had failed to demonstrate a justification for deviating from the statutory guidelines by ordering Branch to pay the children's tuition.

The determination of child support is a matter of discretion for the circuit court, and therefore we will not disturb its judgment on appeal unless plainly wrong or unsupported by the evidence. Vissicchio v. Vissicchio, 27 Va. App. 240, 253, 498 S.E.2d 425, 432 (1998). In reaching its decision, the circuit court properly considered both the children's need for private school and Branch's ability to pay tuition. Under these circumstances, we find that there was sufficient evidence to support the circuit court's decision to decline to deviate from the child support guidelines to include the cost of the children's private school tuition, and therefore we find no abuse of discretion.

### D. Child Support Arrearages

Oley next argues that the circuit court erred by failing to award him child support arrearages.

The circuit court found that there were no child support arrearages as of February 28, 2013. The juvenile and domestic relations district court had set Branch's monthly payments at $453.75 per month for the four children. The circuit court adopted that number for the four

children but lowered her payments to $400 a month beginning March 1, 2013, the date of the fourth child's eighteenth birthday. Consequently the circuit court found that Branch had a credit for the payments made from March 1, 2013 to May 22, 2013 and there was an overage in the amount of $163.42 as of May 31, 2013. Because we are remanding this case to the circuit court to recalculate the presumptive guidelines before any deviations respecting the parties' monthly child support, and because the circuit court's determination regarding alleged arrearages was based upon the monthly support obligations it ordered, we need not address this issue.

### E. Due Process

Oley's final argument is that he did not receive a fair hearing because the circuit court was biased and he therefore should receive a new trial. Specifically he argues that the circuit court's deviations from the guidelines are "so far removed" from similar cases in Virginia, that there is a "strong appearance of bias." Further, he asserts that while he "does not claim any knowledge of any pre-disposition by the [circuit] court," its

> verbal utterances of apparent favoritism of mother, bias against father, viewed in tandem with the Final Order, one would be hard pressed not to see the appearance that the [circuit] court simply used judicial authority and statutorily granted powers of deviation to correct a personally perceived injustice not supported by the evidence or the facts, nor grounded in law.

Oley cites no authority in support of his position that his due process rights were violated. "Rule 5A:20(e) provided, in part, that the opening brief shall include '[t]he principles of law, the argument, and the authorities relating to each question presented.'" Atkins v. Commonwealth, 57 Va. App. 2, 20, 698 S.E.2d 249, 258 (2010). "The Supreme Court concluded that 'when a party's 'failure to strictly adhere to the requirements of Rule 5A:20(e)' is significant, 'the Court of Appeals may . . . treat a question presented as waived.'" Id. (quoting Parks v. Parks, 52 Va. App. 663, 664, 666 S.E.2d 547, 548 (2008)). "If the parties believed that the circuit court erred, it was their duty to present that error to [the Court of Appeals] with legal authority to

- 17 -

support their contention." Fadness v. Fadness, 52 Va. App. 833, 851, 667 S.E.2d 857, 866 (2008). Because Oley provides no legal argument or authority in his brief to support his position that he was denied due process of law and did not receive a fair hearing, his argument is waived under Rule 5A:20(e).

Moreover, Oley fails to demonstrate any reversible error. "A litigant is denied due process if his or her case is heard before a judge who harbors 'such bias or prejudice as would deny [the litigant] a fair trial.'" Piatt v. Piatt, 27 Va. App. 426, 435-36, 499 S.E.2d 567, 572 (1998) (quoting Welsh v. Commonwealth, 14 Va. App. 300, 314, 416 S.E.2d 451, 459 (1992)). Oley concedes that he has no knowledge of any pre-existing bias of the circuit court, but rather asserts that the circuit court's rulings and remarks from the bench demonstrated partiality. This argument is without merit. As the factfinder, the circuit court's function is to make credibility determinations. In this capacity it found Branch credible and Oley not credible. All of the circuit court's legal rulings demonstrated an appropriate application of reason and impartiality.

## III. CONCLUSION

In sum, we reverse the circuit court's judgment excluding Branch's Pell Grant from the computation of her gross income under Code § 20-108.2(C). We remand this case to the circuit court for recalculation of the child support schedule to include Branch's Pell Grant as part of her "gross income" before it considers any deviation pursuant to Code § 20-108.1(B). The circuit court's judgment regarding all other issues before us is affirmed.

Affirmed in part,
reversed in part,
and remanded.