IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-416

Filed 5 November 2024

Currituck County, Nos. 23JA12–17

IN THE MATTERS OF:

B.E., L.E., L.E., C.W., F.W., B.W.

Appeal by respondent-mother from orders entered 6 February 2024 by Judge Meader W. Harriss, III in Currituck County District Court. Heard in the Court of Appeals 9 October 2024.

*Richard Croutharmel for respondent-appellant mother.*

*Frank P. Hiner, IV for petitioner-appellee Currituck County Department of Social Services.*

*Ward and Smith, P.A., by Mary V. Cavanagh and Genesis E. Torres, for guardian ad litem.*

FLOOD, Judge.

Respondent-Mother appeals adjudication and disposition orders by the trial court, contending: (A) the trial court did not have subject matter jurisdiction because the state of Virginia had previously filed a child custody order as to some of the children, and (B) the trial court erred when it transferred the cases to Chapter 50 actions because the trial court failed to make the requisite N.C. Gen. Stat. § 7B-911(c) findings to support such a transfer. Upon review, we conclude the trial court had

proper subject matter jurisdiction and thus dismiss that claim. We also dismiss Respondent-Mother's assignment of transfer error because N.C. Gen. Stat. § 7B-911(c) applies only to civil custody orders, from which Respondent-Mother has not appealed.

## I. <u>Factual and Procedural Background</u>

On 26 June 2023, the Currituck County Department of Social Services ("DSS") filed juvenile petitions alleging neglect of the children B.E. ("Ben"), L.E. ("Lexi"), L.E. ("Lea"), C.W. ("Corwin"), F.W. ("Fawn"), and B.W. ("Breawna").[1] The juveniles ranged in age from three years to sixteen years.

The day before DSS filed its petitions, on 25 June 2023, Respondent-Mother's neighbor was awoken early Sunday morning by a tapping noise coming from her front door. The neighbor opened her front door and found a "small child standing there with nothing on but a soggy diaper." The child was between two and three years of age, and the neighbor did not recognize the child. The child ran off in the direction of the street; the neighbor chased the child and grabbed the child's hand, concluded the child was likely Respondent-Mother's, and walked the child to Respondent-Mother's home.

Upon arriving at Respondent-Mother's home, the neighbor found the front door open, and the child went inside. The neighbor knocked on the front door but did not

---

[1] Pseudonyms agreed upon by the parties are used to protect the identities of the minor children pursuant to N.C.R. App. P. 42(b).

enter the house. Respondent-Mother then walked halfway down the stairs from upstairs, came into the neighbor's view, and appeared to have just awakened. The neighbor asked Respondent-Mother if the child was hers, to which Respondent-Mother responded with a mumbling sound. The neighbor left and called DSS to report the incident.

After the neighbor left, Respondent-Mother woke sixteen-year-old Corwin and told him to "get up" because they were "going to the beach." Five minutes before leaving, Respondent-Mother confided to Corwin that "CPS is on the way, we have to leave."[2] Respondent-Mother and the children left by car, with Corwin in the passenger seat, and Ben, Lexi, Fawn, and Breawna in the back seat along with their two dogs. At this time, Respondent-Mother was also the adoptive mother of Lea, but she had driven Lea to Ohio two days before, around 23 June 2023, to give her to Lea's biological mother without any court order or without the knowledge of Lea's biological father.

The children did not have breakfast before leaving, nor had they packed any extra clothes for the trip. Several of the children had been prescribed medication, which had also been left at the house. A few of the children brought their phones, but Respondent-Mother confiscated the phones thirty minutes into the drive and proceeded to turn off the phones' locator function.

---

[2] We understand this abbreviation to mean Child Protective Services.

Three hours into the trip, Respondent-Mother informed Corwin that they were not actually going to the beach, but instead, she was taking them to a mental hospital because "we all need[] help." At some point during the drive, Breawna proclaimed she needed to urinate, but Respondent-Mother would not stop, and Breawna subsequently urinated on herself inside the car. Respondent-Mother drove two more hours before stopping at a Target retail store and sending Corwin inside to buy Breawna a new change of clothes.

At another point during the drive, in the afternoon, Respondent-Mother stopped the car at a Taco Bell restaurant. Corwin and Respondent-Mother began fighting, and Corwin exited the car. Respondent-Mother drove around the parking lot while Corwin sat on a bench. A police officer eventually arrived and approached Corwin, who informed the officer that "his mother mentally and physically abuses him and his siblings" and described several incidents of Respondent-Mother's poor behavior and treatment of the children. The officer told Corwin to get back in the car with Respondent-Mother and that the officer would make a report.

After leaving the Taco Bell, Respondent-Mother drove the children to a friend's home in Winston-Salem, where they stayed for the next two nights. At the friend's home, there were two other young girls and a boy. Respondent-Mother's children and the other children shared rooms. While they were at the friend's home, Respondent-Mother bought her children a change of clothes, but the two youngest children did not have shoes, and none of the children had toothbrushes.

On 27 June 2023, at 10:00 p.m., Respondent-Mother gathered her children in the car and informed them they were heading back home. At some point during the drive, however, she informed the children that they were going a mental hospital in Asheville because "[w]e all need help." On 28 June 2023, at around 2:30 a.m., Respondent-Mother and the children arrived in Asheville, but the Record is unclear as to where they arrived, exactly.

During Respondent-Mother's period of driving the children across North Carolina, DSS called Respondent-Mother multiple times and became concerned with Respondent-Mother's mental health. During the phone calls with DSS, Respondent-Mother spoke "very rapid[ly]" and "incoherent[ly]" with "no details or specifics," "jump[ed] from one thing to another," and claimed she had filed a case against DSS with the Supreme Court of the United States. She also told DSS she had made appointments for the children at Brynn Marr Behavioral Hospital because they were in a state of crisis; however, DSS later confirmed there were no appointments that had been made for the children. At some point Respondent-Mother stopped communicating with DSS, and DSS contacted the fathers of the children and maternal grandparents to try to figure out where Respondent-Mother was taking the children. DSS also contacted many hospitals and law enforcement agencies during this time to help determine the location of the children.

On 28 June 2023, DSS received a call from a child crisis center in Buncombe County, and from the information imparted in this call, DSS was able to retrieve the

children from the center and pick up Lea from Ohio. The Record is unclear whether Respondent-Mother was with the children at the crisis center or had dropped the children off.

The Currituck County District Court, Judge Meader W. Harriss, III presiding, held a hearing on 13 December 2023 on DSS' petitions alleging neglect of the children. The trial court found that, based on Respondent-Mother's actions, as described above, the children were neglected. Regarding Lea, the trial court found that Respondent-Mother and Lea's biological father had previously entered a divorce decree in Virginia, which included a separation agreement ("Virginia Separation Agreement"), granting Respondent-Mother custody over Lexi, Lea, and Ben (the "E children"). From this Virginia Separation Agreement, the trial court found Respondent-Mother's placement of Lea with Lea's biological mother was worrisome, as the agreement listed "numerous concerns and constraints" related to Lea's biological mother.

At the hearing, the father of the E children testified that Lexi and Ben had lived in Currituck County with Respondent-Mother their entire lives, and Lea had lived there since October 2018, prior to her short placement with her biological mother by Respondent-Mother. The trial court determined the state of Virginia did not properly follow the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") when entering its Virginia Separation Agreement and ruled the Virginia Separation Agreement was null and void as it pertained to the E children. The trial court concluded that North Carolina was the home state of all the children under the

UCCJEA, and that it had the proper subject matter jurisdiction under the UCCJEA to enter the relevant orders.

After the hearing, the trial court entered an adjudication order on 6 February 2024, adjudicating the children as neglected juveniles. That same day, the trial court also entered two dispositional orders, one for the E children and the other for Corwin, Fawn, and Breawna (the "W children"). The trial court concluded that it was in the best interests of the E children to be with their father and ordered no visitation from Respondent-Mother. The trial court also concluded for the W children that it was in their best interests to be with their father and ordered no visitation from Respondent-Mother.

At the end of dispositional orders, the trial court noted the cases should be transferred to a Chapter 50 proceeding, but that it would retain jurisdiction "[u]ntil [the case] is converted into a Chapter 50 civil custody order[.]" Respondent-Mother timely appealed on 14 February 2024.

## II. <u>Jurisdiction</u>

This Court has jurisdiction over Respondent-Mother's appeal pursuant to N.C. Gen. Stat. §§ 7A-27(b)(2), and 7B-1001(a)(3)–(4) (2023).

## III. <u>Analysis</u>

On appeal, Respondent-Mother contends: (A) the trial court did not have subject matter jurisdiction as to the E children, and (B) the trial court erred when it transferred the cases on disposition to Chapter 50 actions. We address each

argument, in turn.

## A. Subject Matter Jurisdiction

Respondent-Mother first argues the trial court did not have subject matter jurisdiction over the E children because the state of Virginia had previously filed a child custody order as to the E children and was therefore the proper state to determine any changes. We disagree.

"Issues of subject matter jurisdiction may be raised for the first time on appeal." *In re K.A.D.*, 187 N.C. App. 502, 503, 653 S.E.2d 427, 428 (2007). "In reviewing a question of subject matter jurisdiction, our standard of review is *de novo*." *Id.* at 503, 653 S.E.2d at 428 (citation omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the trial court." *In re K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022) (citation omitted) (cleaned up).

"It is axiomatic that a trial court must have subject matter jurisdiction over a case to act in that case." *In re J.H.*, 244 N.C. App. 255, 259, 780 S.E.2d 228, 233 (2015) (citation omitted). "When a [trial] court decides a matter without . . . having jurisdiction, then the whole proceeding is null and void, *i.e.,* as if it had never happened." *Id.* at 259, 780 S.E.2d at 233 (citation omitted). Further,

> the North Carolina Juvenile Code grants our district courts "exclusive, original jurisdiction over any case involving a juvenile who is alleged to be abused, neglected, or dependent." However, the jurisdictional requirements of the [UCCJEA] and the Parental Kidnapping Prevention

Act ("PKPA") must also be satisfied for a court to have authority to adjudicate petitions filed pursuant to our juvenile code.

*In re E.J.,* 225 N.C. App. 333, 336, 738 S.E.2d 204, 206 (2013) (internal citation omitted).

As provided by the UCCJEA, a trial court, whether in North Carolina or Virginia, has subject matter jurisdiction to enter an initial child custody order:

> (a) Except as otherwise provided in [N.C. Gen. Stat.] 50A-204, a court of this State has jurisdiction to make an initial child-custody determination only if:
>
> (1) This State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding, and the child is absent from this State but a parent or person acting as a parent continues to live in this State;
>
> (2) A court of another state does not have jurisdiction under subdivision (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this State is the more appropriate forum under [N.C. Gen. Stat.] 50A-207 or [N.C. Gen. Stat.] 50A-208, and:
>
> a. The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and
>
> b. Substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships[.]

N.C. Gen. Stat. § 50A-201 (2023); *see also* Va. Code Ann. § 20-146.12(A)(1)–(4).

"Giving priority to a child's home state is the central provision of the UCCJEA, and

the UCCJEA is intended to avoid jurisdictional competition and conflict with courts of other States in matters of child custody." *Sulier v. Veneskey*, 285 N.C. App. 644, 666, 878 S.E.2d 633, 646 (2022) (citation omitted) (cleaned up). "If North Carolina is the 'home state' and 'a parent or person acting as a parent continues to live in this State,' jurisdiction falls under subsection (a)(1)." *Id.* at 666, 878 S.E.2d at 646; *see also In re N.B.*, 289 N.C. App. 525, 530, 890 S.E.2d 199, 203 (2023) ("A child's 'home state' under the UCCJEA is the state in which the child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding, including a proceeding on abuse, neglect, or dependency allegations." (citation and internal quotation marks omitted) (cleaned up)).

Respondent-Mother does not challenge the trial court's finding of fact that North Carolina is the home state for the E children. This finding is binding on appeal. *See In re D.S.*, 286 N.C. App. 1, 13, 879 S.E.2d 335, 344 (2022) (providing that uncontested findings of fact are binding on appeal).

Respondent-Mother, instead, contends the trial court was not permitted to end its analysis with the children's home state, but it was also required to conduct a "significant connection" analysis under N.C. Gen. Stat. § 50A-201(a)(2) (2023) and Va. Code Ann. § 20-146.12(A)(2). Both North Carolina and Virginia, however, place the home state as the primacy place of jurisdiction for child custody, and the trial court need look further only if there is no home state. *See Chick v. Chick*, 164 N.C.

- 10 -

App. 444, 448, 596 S.E.2d 303, 307 (2004) ("Under . . . North Carolina's UCCJEA . . . jurisdictional primacy is given to the home state of a minor child."); *see also Prizzia, v. Prizzia*, 58 Va. App. 137, 148, 707 S.E.2d 461, 466 (2011) (holding the home state as "the exclusive jurisdictional basis for making a child custody determination by a court of this Commonwealth").

A trial court shall recognize and enforce another state's child custody order if that other state "exercised jurisdiction in substantial conformity" with the UCCJEA when making its child custody determination. N.C. Gen. Stat. § 50A-303 (2023). Under the UCCJEA, both North Carolina and Virginia must determine the children's home state before entering a child custody order. *See* N.C. Gen. Stat. § 50A-201(a)(2) (2023) (providing that a trial court must determine that another state is not the home state or that the home state has declined to exercise jurisdiction); *see also* Va. Code Ann. § 20-146.12(A)(2) (providing the same determination requirements as articulated in N.C. Gen. Stat. § 50A-201(a)(2)).

When Virginia made its initial child custody determination in 2023, all three of the E children had been living in North Carolina at least since 2018, making North Carolina the home state under the UCCJEA, and North Carolina had not declined jurisdiction. *See* N.C. Gen. Stat. § 50A-201(a)(2); *see also* Va. Code Ann. § 20-146.12(A)(2). The trial court was not required to recognize and enforce the Virginia Separation Agreement. *See* N.C. Gen. Stat. § 50A-303 (providing that a trial court does not have to recognize and enforce another state's child custody order if that other

state failed to "exercise[] jurisdiction in substantial conformity" with the UCCJEA).
Without proper jurisdiction under the UCCJEA, the Virginia Separation Agreement
was null and void as it pertained to the children. *See In re J.H.*, 244 N.C. App. at
259, 780 S.E.2d at 233. As the home state, North Carolina acquired proper
jurisdiction under the UCCJEA to enter the child custody determinations. *See* N.C.
Gen. Stat. § 50A-201(a)(1) (2023).

Because North Carolina is the home state of the E children, the trial court was
not required to recognize the Virginia Separation Agreement, and it properly
exercised subject matter jurisdiction over the matter. *See* N.C. Gen. Stat. § 50A-201;
*see also* N.C. Gen. Stat. § 50A-303. Accordingly, we dismiss Respondent-Mother's
claim regarding lack of subject matter jurisdiction.

**B. Transfer to Chapter 50**

Respondent-Mother also argues the trial court erred when it transferred the
cases on disposition to Chapter 50 actions, because the trial court failed to make the
requisite N.C. Gen. Stat. § 7B-911(c) findings to support such a transfer. Specifically,
Respondent-Mother contends "neither disposition order contains a finding that
continued State intervention on behalf of the juveniles through a juvenile court
proceeding is no longer necessary." We disagree.

"[T]he failure to follow a statutory mandate is a question of law" and is
reviewed de novo. *In re G.C.*, 230 N.C. App. 511, 516, 750 S.E.2d 548, 551 (2013).
Under N.C. Gen. Stat. § 7B-911(a), "[u]pon placing custody with a parent or other

appropriate person, the [trial] court shall determine whether or not jurisdiction in the juvenile proceeding should be terminated and custody of the juvenile awarded to a parent or other appropriate person[.]"  N.C. Gen. Stat. § 7B-911(a)(2023).  To terminate a juvenile proceeding and enter the case to a Chapter 50 proceeding as a civil action, the trial court must make certain findings of fact, including whether "[t]here is not a need for continued State intervention on behalf of the juvenile through a juvenile court proceeding."  N.C. Gen. Stat. § 7B-911(c)(2) (2023).

This Court has previously held that "N.C. Gen. Stat. § 7B–911(c) applies only when a trial court *enters* a civil custody order under this section and terminates the court's jurisdiction in a juvenile proceeding."  *In re H.S.F.*, 182 N.C. App. 739, 743–44, 645 S.E.2d 383, 385 (2007) (citation omitted) (cleaned up) (emphasis added).  In *In re H.S.F.*, the respondent similarly argued the trial court failed to make the proper findings of fact under N.C. Gen. Stat. § 7B–911(c), and appealed from the review order where the trial court stated "[pursuant] to N.C. [Gen. Stat.] 7B–911, the Clerk of Court shall open a Chapter 50 file[.]"  *Id.* at 741, 645 S.E.2d at 384.

Upon review, this Court held that, "[a]ccording to [N.C. Gen. Stat. § 7B–911(c)'s] plain and definite meaning, the requirements of N.C. Gen. Stat. § 7B–911(c) only apply to civil custody orders[.]"  *Id.* at 744, 645 S.E.2d at 385–86.  Thus, we dismissed the respondent's appeal for failure to appeal from an entered civil custody order to which an N.C. Gen. Stat. § 7B–911(c) argument would apply.  *Id.* at 744, 645 S.E.2d at 386.

Here, Respondent-Mother appeals only from an adjudication order and two dispositional orders, but not from civil custody orders. The trial court's dispositional orders state the trial court will retain jurisdiction "[u]ntil [the case] is converted into a Chapter 50 civil custody order[.]" Although the language of N.C. Gen. Stat. § 7B–911(c) has changed since 2007, the current plain language of the statute provides that the trial court must make the necessary findings "[w]hen entering an order under [Chapter 50.]" N.C. Gen. Stat. § 7B–911(c). Thus, under our caselaw and statutes, Respondent-Mother's argument is without merit as there is no civil custody order appealed from for which N.C. Gen. Stat. § 7B–911(c) would apply. *See In re H.S.F.*, 182 N.C. App. at 743–44, 645 S.E.2d at 385. Accordingly, we dismiss this assignment of error. *See id.* at 743–44, 645 S.E.2d at 385.

## IV. <u>Conclusion</u>

Upon our de novo review, we conclude the trial court had proper subject matter jurisdiction and North Carolina was the home state. We therefore dismiss Respondent-Mother's subject matter jurisdiction claim. Additionally, we dismiss Respondent-Mother's argument that the trial court did not make the statutorily required findings of fact under N.C. Gen. Stat. § 7B–911(c) when transferring the case to Chapter 50, because N.C. Gen. Stat. § 7B–911(c) applies only to appeals from civil custody orders, and Respondent-Mother does not appeal from such an order.

DISMISSED.

Judges TYSON and GORE concur.